UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                   :

UNITED STATES OF AMERICA
                                                   :

    - v -                                                        07 Cr. 440 (PGG)
                                                   :

VLADIMIR ZDOROVENIN,
                                                   :

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

                                                      PREET BHARARA
                                                      United States Attorney for the
                                                      Southern District of New York
                                                      Attorney for the United States
                                                          of America

JAMES J. PASTORE, JR.
Assistant United States Attorney
    - Of Counsel –

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :

UNITED STATES OF AMERICA

                                                :

    - v -                                         07 Cr. 440 (PGG)

                                                :

VLADIMIR ZDOROVENIN,

                                                :

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **SENTENCING MEMORANDUM OF THE UNITED STATES**

### **Preliminary Statement**

The Government respectfully submits this memorandum in advance of the sentencing of Vladimir Zdorovenin ("Zdorovenin" or "the defendant"), which is scheduled for January 4, 2013 at 2:30 p.m., and in response to the defendant's sentencing memorandum of December 26, 2012 ("Def. Memo").[1] Given the seriousness of the defendant's conduct, and the need to promote deterrence in this extradition case, the Government respectfully requests that the Court impose a sentence within the applicable advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 51 to 63 months' imprisonment. Such a sentence will be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

### **Background**

**A.**    **The Indictment**

On May 31, 2007, Vladimir Zdorovenin together with one of his sons, Kirill Zdorovenin, was charged in a nine-count Indictment, 07 Cr. 440 (PGG) (the "Indictment") in connection with his commission of various cybercrimes and financial frauds. (Pre-Sentence Investigation Report

---

[1]     In light of the defendant's revised sentencing submission, the Government respectfully withdraws its prior sentencing submission of December 3, 2012, and its accompanying exhibits.

("PSR") ¶¶ 1-10.) The defendant subsequently was extradited from Switzerland, where he had been arrested while traveling, and was presented before Magistrate Judge Gabriel W. Gorenstein on or about January 17, 2012. On or about February 17, 2012, the defendant pled guilty to Counts One and Eight of the Indictment before Magistrate Judge Gorenstein pursuant to a plea agreement with the Government. (PSR ¶ 12). Your Honor accepted the defendant's guilty plea on or about December 2, 2012.

**B.     The Offense**

As set forth more fully in the PSR, the defendant participated in a series of cybercrimes that enabled him and his son to fraudulently obtain money, including by stealing individuals' credit card information and making charges on their cards, as well as by hacking into stock brokerage accounts and using the buying power of those accounts to manipulate stock prices for their personal gain. (PSR ¶¶ 16-23.) As the defendant acknowledges in his sentencing submission, while his son, Kirill, was primarily responsible for the technical aspects of the fraud, the defendant was responsible for contacting new partners who would establish bank accounts that were then used to access the funds the defendants' fraudulently obtained through their schemes. (Def. Memo at 9-10.) The defendant's direct and personal involvement was significant because, as the defendant notes, his participation gave the operation "a certain amount of 'gravitas'" and was intended to reassure prospective business partners in order to convince them to participate in the fraud. (Def. Memo at 9.)

Indeed, it was the defendant – not Kirill – who first communicated with an individual who (unbeknownst to the defendant) was working with the Federal Bureau of Investigation ("FBI"). The defendant's communications with that person ultimately resulted in two days of

meetings with a cooperating witness ("CW") in Cyprus. The first meeting occurred on June 24, 2004 and lasted more than four hours. Kirill did not participate in this meeting.

During the meeting, which was surveilled and recorded by the FBI, the defendant provided substantial details about the nature of the cybercrimes and financial frauds that he and his son Kirill perpetrated. Among other things, the defendant explained that he primarily handled the movement of money through various shell companies and bank accounts, while Kirill handled technical aspects of the fraud. The defendant displayed a depth of knowledge regarding money laundering, noting that he would transfer money frequently between accounts to wash the money, and that the money would be sent through various companies before being withdrawn in Latvia.

The defendant also explained that the CW's role was to open bank accounts that could then be used as part of the fraud, so that the proceeds obtained from various forms of computer hacking could be withdrawn by the defendant and his co-conspirators

As the Government noted during the defendant's guilty plea proceeding, the defendant admitted that his role was "to interact with the bankers who helped him get the cash and accept his money without asking what the money is." (*See* Guilty Plea Transcript at 16).

The day after the June 24, 2004 meeting, Zdorovenin introduced his son, Kirill, to the CW. As with the prior meeting, this meeting also was surveilled and recorded by the FBI. Zdorovenin once again was an active participant in the meeting, discussing, among other things:

- financial institutions' methods for detecting fraud and closing accounts;
- using brokerage accounts to commit fraud;
- using "drop" services to receive fraudulently purchased merchandise;
- purchasing stolen credit card information;

3

- forming shell companies to use in the fraud; and

- establishing a code phrase with the CW that could be used if anyone in the conspiracy was arrested.

Upon returning to America, the CW spoke with the defendant by phone to discuss other details of the fraud. Ultimately, as noted above, the defendant and his son, Kirill, were indicted in May 2007.

**C.     The Presentence Investigation Report And Guidelines Calculation**

The PSR calculates that the defendant has zero criminal history points and is therefore in Criminal History Category I (PSR ¶ 44). The PSR calculates a base offense level of 7; an enhancement of 14 levels because the loss amount exceeded $400,000 but is not more than $1,000,000; a two-level enhancement because the offense involved more than 10 victims; a two-level enhancement because the fraud was committed from outside of the United States; and a two-level enhancement because the offense involved computer hacking intended to obtain an individual's personal information, for a total offense level of 27. (PSR ¶¶ 29-37). The PSR calculates that the defendant is eligible for a three-level reduction based on his acceptance of responsibility as evidenced by his timely guilty plea. (PSR ¶ 38.) (Indeed, only a month after arriving in the United States, the defendant accepted responsibility and pled guilty to his conduct without requesting discovery from the Government.) The PSR thus calculates a total adjusted offense level of 24. (PSR ¶ 41.)

Based on a total offense level of 24 and a Criminal History Category of I, the PSR calculates an advisory Guidelines range of 51 to 63 months' imprisonment. (PSR ¶ 70.) These calculations are consistent with the parties' plea agreement. The PSR recommends a sentence of 51 months' imprisonment, the very bottom of the applicable Guidelines range. (PSR at page 18.)

**Discussion**

A.   **The Applicable Law And The Appropriate Sentence**

The United States Sentencing Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

5

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

B.  **A Within-Guidelines Sentence Will Appropriately Reflect The Seriousness Of The Offense And Promote Deterrence**

The defendant urges the Court to impose a non-Guidelines sentence primarily because (a) the defendant was not involved in the technical aspects of the fraud and participated in it out of a desire to connect with his formerly estranged son, Kirill; and (b) a Guidelines sentence would have no additional deterrent effect as compared to a sentence of 24 months' imprisonment. These arguments do not provide a compelling basis to impose a non-Guidelines sentence.

The defendant devotes a substantial portion of his sentencing submission to arguing that he had a "limited role" in the fraud because his presence merely lent a "gravitas" to the operation and reassured potential partners so that they would feel comfortable participating in the fraud, while the technical details were handled by his son, Kirill. (Def. Memo at 9-10.) Even crediting these assertions, it is clear that the defendant played a substantial part in ensuring the ultimate success of the fraud. As the defendant correctly notes, he "was older, well-spoken, and well heeled; the perfect foil to a young entrepreneur." (Def. Memo 9.) The success of even the most technically savvy fraud turns on whether the fraudster can ultimately obtain the proceeds of his or her crime. The defendant candidly admits that he helped supply this important link for his son. (Def. Memo at 10.)

The defendant claims that he acted not out of greed, but because he was hoping to build a relationship with his formerly estranged son. (*See, e.g.*, Def. Memo at 10.) This explanation – dubious on its face – is belied by the defendant's behavior during his hours of meetings with the CW, when he referred several times to the money that could be made through the various

6

fraudulent schemes. Moreover, throughout his hours of meetings with the CW, the defendant displayed a depth of knowledge about the fraud that makes it difficult to believe that he was merely following directions from his son. Even were the Court to credit that explanation for the defendant's conduct, however, it does nothing to lessen the harm that the schemes ultimately inflicted on the victims. Simply put, the defendant provided critical services to the fraudulent schemes, thus ensuring their success; the seriousness of this behavior is appropriately reflected in the applicable advisory Guidelines range.

The defendant's wholesale attack on the concept of general deterrence is also not a compelling reason to impose a below-Guidelines sentence here. That position is at odds with the very statute that the Court is obligated to apply, and it should be rejected. As noted above, the need to adequately deter criminal conduct is an enumerated factor in Section 3553(a). As the courts have made clear, this includes general deterrence, and is not limited to specific deterrence. *United States v. Smalls*, 291 Fed. Appx. 397 (2d Cir. 2008) (district court's sentence appropriately "reflected the need for the sentence to reflect general deterrence"). *United States v. $3,663.00 in United States Currency*, 205 F.3d 1326 (2d Cir. 2000) ("General deterrence of criminal conduct is an appropriate factor for the court to consider.").

The defendant cites studies that purportedly stand for the proposition that "increased punishments are generally unnecessary to provide the general deterrent effected sought by Section 3553(a)(2)(B)." (Def. Memo at 27.) Yet, even some of the studies to which the defendant refers explicitly acknowledge a link between punishment and deterrence. *See, e.g.*, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1. 29-30 (2006) ("Having a system of punishments has deterrent effects. Having punishments scaled to the

7

severity of offenses should provide rational incentives . . .to commit fewer rather than more serious crimes.")

The defendant also cites several cases in which downward variances were granted where the Guidelines were dramatically higher than in this case, or where the defendant's advanced age, coupled with a very high Guidelines range, would have resulted in the functional equivalent of a life sentence if the Guidelines were followed. (*See, e.g.*, Def. Memo at 17-21, 28-30 (citing, among other cases, *Simon v. United States*, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) (variance to 240 months' imprisonment where Guidelines recommended 324 months' imprisonment); *United States v. Nellum*, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (108-month prison term imposed where Guidelines recommended 168 months' imprisonment for 57-year old defendant); *United States v. Vilar*, 05 Cr. 621 (RJS) (varying downward where a within-Guidelines sentence of 22 years for a 69-year-old defendant "would be a life sentence;" nine-year sentence imposed); *United States v. Drier*, 09 Cr. 85 (JSR) (varying downward where Guidelines recommended a life sentence)). In contrast, here the advisory Guidelines range is 51 to 63 months' imprisonment, the defendant is just 55 years old, and he already has been incarcerated for approximately 21 months. Thus, unlike in the cases the defendant cites, a within-Guidelines sentence would not function as the equivalent of a life sentence. Accordingly, the defendant's argument that a downward variance is appropriate in light of the defendant's "advanced age" is not particularly compelling here.

To the contrary, the 51 to 63 months' imprisonment called for by the Guidelines seems commensurate with the defendant's criminal conduct. Such a sentence also will send the

appropriate deterrent message to those abroad who target United States citizens and financial institutions with fraudulent schemes.[2]

**Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 51 to 63 months' imprisonment.

Dated: New York, New York
December 30, 2012

                                                Respectfully submitted,

                                                PREET BHARARA
                                                United States Attorney

By:    /S/
       James J. Pastore, Jr.
       Assistant United States Attorney
       Tel.: (212) 637-2418

---

[2] The defendant cites his "offer to cooperate" (Def. Memo at 24-25) as another basis for a downward variance. The defendant never proffered with the Government, nor did he give any indication of what information he might be able to provide.